IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FRANCES BORING,                        )
                                       )
        Plaintiff,                     )
                                       )
        vs.                            )    Civil Action No. 06-256
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
        Defendant.                     )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Frances Boring and Defendant Michael J.
Astrue, Commissioner of Social Security. Plaintiff seeks review of
a final decision by the Commissioner denying her claim for
disability insurance benefits ("DIB") under Title II of the Social
Security Act, 42 U.S.C. §§ 401 *et seq.* For the reasons discussed
below, Defendant's motion is granted and Plaintiff's motion is
denied.

### II.   BACKGROUND

#### A.    Factual Background

After graduating from high school in 1964, Frances Boring
completed beauty school in 1975 and worked for several years as a
beautician in Johnstown, Pennsylvania. (Transcript of Proceedings,
Docket No. 6, "Tr.," 62.) Plaintiff stopped working in 1991 after
she began experiencing pain in her back and legs. Ms. Boring

consulted with Dr. Gary Thomas, a general practitioner, as early as 1992 (Tr. 173), but he was unable to determine the cause of her problem. Over the years, Ms. Boring also began to experience muscle tightness and very high muscle tone, particularly in her lower extremities. (Tr. 121.)

In January 1996, Plaintiff was involved in a motor vehicle accident which exacerbated the muscle tightness and spasms on her entire right side, especially in her neck, shoulder, back and legs. (Tr. 118.) Despite x-rays and an MRI which showed only "some facet changes in the lumbar spine," Ms. Boring continued to experience significantly increased muscle tone in her legs and calves which Dr. Thomas was unable to diagnose. (Tr. 116.)

In June 1996, at Dr. Thomas's recommendation, Ms. Boring was examined at the Cleveland Clinic in Cleveland, Ohio. (Tr. 90-98.) Specialists there were equally unable to determine the cause of her condition.

Pain and cramps in her legs, numbness after prolonged sitting, diminished pulses in her ankles, back pain, and hardness and tightening of the muscles of her legs became especially severe after March 2003. (Tr. 102-110.) Finally, on November 11, 2004, Ms. Boring was examined by Dr. Paula McMurtry, a rheumatologist, who performed a skin biopsy and a number of blood tests. (Tr. 134.) The results of the biopsy showed chronic lymphocytes and

2

collagen levels consistent with scleroderma[1] which Dr. McMurtry treated with methotrexate.[2] (Tr. 130-131, 101.) On January 20, 2005, Dr. McMurtry advised the Pennsylvania Department of Public Welfare that in her opinion, Ms. Boring had become permanently disabled as of December 10, 2004, due to her slowly progressing scleroderma. (Tr. 135-136.)

## B. Procedural Background

On January 24, 2005, Ms. Boring protectively filed an application for Social Security disability insurance benefits, claiming that she had become disabled as of May 1, 1991. (Tr. 47.) This application was denied on May 19, 2005, inasmuch as the Social Security Administration ("SSA") determined she could return to her previous work. (Tr. 24-29.) Plaintiff timely requested a hearing before an administrative law judge. (Tr. 30.)

---

[1] Scleroderma is an auto-immune connective tissue disease involving changes in the skin, blood vessels, muscles, and internal organs as the result of the accumulation of collagen. Its cause is unknown; it generally affects people 30 to 50 years old and women are affected more often than men. Symptoms include Raynaud's phenomenon (blanching, blueness, or redness of fingers and toes in response to heat and cold); pain, stiffness, and swelling of fingers and joints; skin thickening or hardness, particularly of the hands, forearms or face; ulcerations on fingertips or toes; digestive difficulties (esophageal reflux, difficulty swallowing, bloating after meals, weight loss, diarrhea or constipation); and shortness of breath. *See* the medical encyclopedia at the National Institute of Medicine's on-line website, www.nlm.nih.gov/medlineplus (last visited January 15, 2008), "Medline Plus."

[2] Methotrexate is an anti-metabolite which slows the increased activity of the immune system associated with numerous connective tissue diseases including rheumatoid arthritis, systemic lupus erythematosus, polymitosis or scleroderma. *See* Medicinenet.com at www.medicinenet.com/scleroderma/article.htm (last visited January 16, 2008) and drugs and supplements at Medline Plus.

3

A hearing was held before the Honorable Patricia Henry on May 26, 2006. Noting that Plaintiff had appeared without counsel, Judge Henry advised Plaintiff of her rights in that regard and offered to continue the hearing until such time as Plaintiff could secure counsel; Ms. Boring elected to proceed *pro se*. (Tr. 178-181.)

On June 27, 2006, Judge Henry issued a decision in which she found that Plaintiff was not disabled at any time prior to her date last insured, March 31, 1996. (Tr. 12-18.) This decision was affirmed by the Appeals Council on September 27, 2006. (Tr. 4-6.) Therefore, the June 27, 2006 opinion of the ALJ became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff, now represented by counsel, filed suit in this Court on December 1, 2006, seeking judicial review of the ALJ's decision.

C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

4

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the

5

decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. LEGAL ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for Social Security disability benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[3] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

To be granted a period of disability and receive disability insurance benefits, a claimant must show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured. 42 U.S.C.

---

[3] According to 20 C.F.R. § 404.1572(a)-(b), substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

6

§ 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Ms. Boring satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured was March 31, 1996. Therefore, in order to receive DIB, Ms. Boring must establish that she became disabled prior to that date.

To determine a claimant's rights to DIB,[4] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity[5] ("RFC") to perform her past relevant work, she is not disabled; and

(5) if, taking into account the claimant's RFC, age,

_____

[4] The same test is applied whether the claimant is seeking DIB or Supplemental Security Income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both types of claims.

[5] Briefly stated, residual functional capacity is what a claimant can do despite his recognized limitations. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." See also 20 C.F.R. § 404.1545.

> education, and past work experience, the claimant can
> perform other work that exists in the local, regional or
> national economy, she is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one through four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy. Gorecki v. Massanari, 197 F. Supp.2d 154, 159 (M.D. Pa. 2001), *citing* Fargnoli v. Massanari, 247 F.3d 34, 39 (3d Cir. 2001).

Following the prescribed analysis, Judge Henry first concluded that Ms. Boring had not engaged in substantial gainful activity at any time relevant to her decision. (Tr. 14.) At step two, she found that through her date last insured, Plaintiff had suffered from scleroderma which was "severe" in that the condition had more than a minimal effect on her ability to perform work-related activities. (Id.)

At step three, the ALJ concluded that the medical evidence supported a finding that Ms. Boring's condition did not meet the requirements of Listing 14.04, systemic sclerosis and scleroderma.[6]

---

[6] We note for the record that although the ALJ correctly referred to Listing 14.04, she concluded Plaintiff's condition did not satisfy that Listing because there was "no evidence of muscle involvement causing severe proximal limb-girdle muscle weakness on or prior to her date last insured." (Tr. 15.) "Severe proximal limb-girdle . . . muscle weakness," as described in Listing 14.05, is only one of five possible conditions which will satisfy Listing 14.04, either alone or in combination. *See* Listing 14.04, sections A-1

8

(Tr. 15.)

At step four, having considered the entire record and the relevant Social Security regulations and rulings, the ALJ found Plaintiff had the residual functional capacity to perform light work which did not require balancing, stooping, kneeling, crouching, crawling or climbing, operation of pedals with the lower extremities, or working in cold temperatures. (Tr. 15.) The postural limitations prevented Plaintiff from performing her past relevant work as a beautician which Dr. Marvin Morris, a vocational expert ("VE") who testified at the hearing, had classified as light, semi-skilled work activity. (Tr. 16.)

Based on Plaintiff's birth date of August 7, 1945, the ALJ determined that according to SSA regulations, Ms. Boring was 45 years old on her alleged onset date, which is considered a "younger individual between 45-49," and 50 years old on her date last insured, that is, an individual "closely approaching advanced age." When combined with her educational level of "at least a high school

---

through A-5 and B, referring to involvement of the respiratory, cardiovascular, digestive, or renal systems in additional to the muscular system. Nor is there any evidence that Plaintiff exhibited the "digital contractures" or "severe Raynaud's phenomena" which would meet Listing 14.04 section C or D. However, Plaintiff does not object to the ALJ's conclusion at step three of the analysis and the Court's review of the medical evidence does not reveal any medical evidence involving the other criteria for Listing 14.04. Therefore, to the extent the ALJ did not consider alternative means of meeting Listing 14.04, such omission was harmless.

9

education,[7]" her ability to communicate in English, the fact that transferability of skills was not material due to Plaintiff's age, her residual functional capacity, the medical evidence of record, and Ms. Boring's testimony at the hearing, the ALJ concluded that at all times prior to her date last insured, Plaintiff was capable of performing a range of unskilled, light-level jobs[8] which existed in significant numbers in the national economy such as a sorter in a college mail room, injection mold press operator, ticket taker or bench assembler, and sedentary work[9] such as a small electronic

_____

[7] The evidence is inconsistent as to Plaintiff's educational level. She testified at the hearing that she did not graduate from high school or receive a GED (Tr. 183), but other evidence indicates she completed 12 years of school as of 1964 (Tr. 62.) Although this issue might be significant in determining if Plaintiff were presumed disabled due to the combination of her education, age, lack of transferrable skills and the possible limitation to sedentary work, because we find the ALJ did not err in her conclusion that Plaintiff could perform a limited range of light work at all times prior to her date last insured, we need not resolve this discrepancy nor remand for further consideration of the issue by the ALJ.

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) and 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

[9] Sedentary work requires lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Jobs are sedentary even if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567. A sedentary job should require no more than approximately 2 hours of standing or walking per eight-hour work day, and sitting should typically amount to six hours per eight-hour

10

parts tester, a television monitor or handpacker of small objects. (Tr. 17; *see also* Tr. 212-213.) Consequently, Plaintiff was not under a disability at any time through her date last insured and was not entitled to benefits. (Tr. 17-18.)

## B. Plaintiff's Arguments

Plaintiff raises four arguments in her brief in support of the motion for summary judgment. ("Plf.'s Brief," Doc. No. 12.) We have reordered these arguments in order to provide a more logical development of ideas. First, the ALJ failed to discuss the weight she gave to the medical opinions of Plaintiff's treating primary care physician Dr. Thomas and her rheumatologist Dr. McMurtry, leaving the Court to guess at the reasoning behind her apparent rejection of evidence from Plaintiff's treating physicians. (Plf.'s Brief at 18-20.) Second, the ALJ erred by dismissing the uncontradicted medical evidence provided by Drs. Thomas and McMurtry, together with Plaintiff's corroborating testimony, that she could not perform light work. That is, rather than reveal that Ms. Boring could perform a limited range of light work as Judge Henry concluded, the evidence "unquestionably" showed she was limited to sedentary work. (Id. at 17.) Third, if as of her date last insured, March 31, 1996, Plaintiff was limited to sedentary work, Social Security Rule 201.10 "plainly directs" a

---

work day. Social Security Ruling 83-10.

finding that she was disabled.[10]  (Id. at 7-8.)  Finally, Plaintiff argues that the ALJ failed to comply with Social Security Ruling[11] 83-20 and Third Circuit precedent which require an ALJ to call a medical expert to testify when the claimant's disability onset date must be inferred rather than determined directly from the medical evidence.  (Id. at 21-22.)

Because we find the ALJ correctly concluded that the medical evidence did not support Plaintiff's contention that she was disabled prior to her date last insured, we need not address these arguments in any detail, but turn directly to the medical evidence provided by Drs. Thomas and McMurtry and the Cleveland Clinic on which the ALJ based her decision.

According to Plaintiff, by May 1991, pain in her legs and back (later diagnosed as being associated with scleroderma) had become so severe she was no longer able to stand for the time necessary to

---

[10]  In 20 C.F.R. Part 404, Subpart P, Appendix 2, the SSA has provided a set of rules informally known as "the grids."  A claimant's chronological age, education (including illiteracy and the ability to communicate in English), and the complexity of previous work experience (including the acquisition of skills which are considered transferable to new types of work) are set out in a matrix according to each level of residual functional capacity determined by the SSA, i.e., sedentary, light, and medium.  If the claimant's personal characteristics match one of the numbered rules in the grids, she is presumed to be disabled.

[11]  "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"  Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1).  "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same."  Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

12

work as a beautician. (Tr. 57-58.) This time-frame is largely consistent with Dr. Thomas's letter of May 12, 2006, in which he stated that he first saw Ms. Boring in 1992. (Tr. 173.) However, he provided no medical records from 1992 or 1993. At a single appointment in 1994, on June 13, Dr. Thomas noted peripheral edema, back problems, and sinus congestion. He reported, however, that she was "doing much better," her back pain was "almost 100 percent resolved," she was rarely taking tolectin,[12] and could do most of her normal activities, e.g., fishing, walking and cutting the grass, "without any difficulty whatsoever." (Tr. 123.)

In 1995, Plaintiff consulted with Dr. Thomas only four times. In January, Ms. Boring complained of continuing low back pain radiating into her buttocks and at times into her anterior thighs, together with "some increased paravertebral spasm in the lumbar area bilaterally." Both tolectin and oruvail[13] were helpful in reducing the pain. (Tr. 122.) On February 14, 1995, Ms. Boring again consulted with Dr. Thomas for back pain. She reported that physical therapy "helps for a few minutes," but the pain returned "rather quickly" following the therapy sessions. All the muscles

---

[12] Tolectin (tolmetin) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis or rheumatoid arthritis. Tolmetin is in a class of medications called nonsteroidal anti-inflammatory drugs ("NSAIDs") which stop the body's production of a substance that causes pain, fever, and inflammation. *See* drugs and supplements at Medline Plus.

[13] Oruvail (ketoprofen) is a NSAID used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis or rheumatoid arthritis. *See* drugs and supplements at Medline Plus.

13

in both her upper and lower extremities were described as "still very tight" and in particular, the muscle tone in her lower extremities and calves was "still very high." She reported experiencing pain following outdoor activity when "she was on her feet a good bit of the day" and an inability to walk for any distance without having to stop and rest. Dr. Thomas hypothesized that the cause of her problem might be spinal stenosis, lumbar disc problems or a connective tissue disorder. He proposed treatment with a TENS unit[14] and ordered additional EMGs of the lower extremities, a CT scan and/or MRI, and blood work. (Tr. 121.) The other two consultations in 1995, on September 28 and October 11, involved upper respiratory infections, bronchitis or sinus problems; on neither occasion was there any mention of symptoms associated with scleroderma. (Tr. 119-120.)

On January 20, 1996, Ms. Boring was involved in a motor vehicle accident in which she struck the back of her head against the headrest and rear window of her truck. Within a few hours of the accident, she experienced head pain, increased tightness and spasms in the right side of her neck, upper extremities, side and lower back. X-rays and an MRI taken at an emergency room were negative, however. She followed up with Dr. Thomas on January 29,

---

[14] A transcutaneous electrical nerve stimulator or TENS unit is a device which electrically stimulates the skin to relieve pain by interfering with the neural transmission of signals from underlying pain receptors. *See* medical dictionary at Medline Plus. Ms. Boring testified she tried the TENS unit on one occasion for an hour, but quit because it did not help. (Tr. 200-201.)

14

1996, due to pain in her neck, right side, shoulder, and back, radiating into her legs. He noted in particular "markedly increased muscle tone in both lower extremities and calves." (Tr. 118.[15]) Dr. Thomas prescribed flexeril[16] for muscle spasms and continued treating her with tolectin and darvocet which had been prescribed for pain at the emergency room.

At a follow-up appointment on February 8, 1996, Dr. Thomas noted that physical therapy had led to "some improvement" although Ms. Boring still had pain radiating from her back to her thighs "especially when walking up a grade." He further noted that the "musculature of the lower extremities is still significantly increased tone [sic] but this appears to be decreasing more toward normal. She is starting to develop more flexibility." (Tr. 117.)

Similarly, on February 22, 1996, Dr. Thomas noted again that physical therapy was helping Ms. Boring make "some progress," although her muscles were "still quite tight" with muscle spastisity in her calves and low back. She was referred for an MRI and prescribed a different muscle relaxant in place of flexeril.

---

[15] Dr. Thomas also noted at this appointment that Ms. Boring stated "she has difficulty performing her normal work activities. She is a beautician and has to stand a good bit of the time." (Tr. 118.) This statement implies that Ms. Boring might still have been working as of January 1996, contrary to her allegation that she no longer worked after 1991.

[16] Flexeril (cyclobenzaprine) is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort. *See* drugs and supplements at Medline Plus.

(Tr. 117.) On March 14, Dr. Thomas noted that the MRI had revealed "some facet changes in the lumbar spine," and that she was having "quite a bit of muscle spasm" in her legs which worsened her lower back pain. Again he noted "significant increased tone of the legs and calves." He indicated he would refer Ms. Boring to a Dr. Savit regarding the increased muscle tone, but the medical record does not appear to include any consultative report from that doctor. (Tr. 116.)

As noted above, in June and July 1996, Ms. Boring was examined at the Cleveland Clinic in an effort to determine the source of her pain. (Tr. 90-98.) At an initial interview on June 18, Ms. Boring's chief complaint was of "hard muscles" and pain in her back and lower extremities down to her ankles, especially when she walked any distance. Her problems had been exacerbated by the accident in January 1996, and as of June 1996, she could only walk two blocks without pain in her leg muscles, although the pain was relieved by sitting for about five minutes. (Tr. 93-94.[17]) On physical examination, the physician noted "tenderness along the spine, balance okay, able to toe walk, unable to walk on heels." He further noted mild "bulked up arms and legs" and normal muscle tone. (Tr. 97-98.) On July 31, 1996, Plaintiff underwent a number of objective tests which appear to have been unsuccessful in

---

[17] The examiner on June 18, 1996, also noted that Ms. Boring was working as a hairdresser only one day a week. (Tr. 95.)

16

finding the source of her muscle spasms. (Tr. 91.[18])

The primary purpose of Ms. Boring's appointments with Dr. Thomas on October 14 and November 18, 1996, was to assist with her weight loss program; there are only passing reference to her other conditions. At the October consultation, Dr. Thomas noted that Ms. Boring was doing well and in November he commented that her physical examination was "grossly unchanged." (Tr. 114-115.)

During the three year period 1997 through 1999, Ms. Boring consulted with Dr. Thomas on only two occasions, the first on November 14, 1997, for swollen glands and the second on April 27, 1998 when her physician noted only that she was taking tolectin "infrequently, when she has pain or working for a long period of time." (Tr. 113.) She saw Dr. Thomas only twice in 2000, cancelled the only appointment scheduled for 2001, and saw him once in 2002. (Tr. 111-112.)

The Court need not review in detail Dr. Thomas's medical records of March 2003 through January 2005 inasmuch as they pertain to a period at least seven years after Plaintiff's date last insured. (Tr. 100-110.) Similarly, Dr. McMurtry's records, the significant portions of which are summarized above in the factual

---

[18] The Court bases this conclusion on Dr. Thomas's notes where he reported that he had "reviewed the letter from the Cleveland Clinic stating that they could not find the source of her muscle spasm." (Tr. 115, Dr. Thomas's notes of October 14, 1996; *see also* Tr. 98, notes from the Clinic proposing several possible, but no definitive, diagnoses.) The letter to which Dr. Thomas referred is not included in his medical records nor in the Cleveland Clinic medical records themselves.

17

history section, date only from November 11, 2004, through February 14, 2005. (Tr. 125-138.)

As noted above, the claimant has the burden of establishing that she suffers from a severe impairment or combination of impairments which significantly limits her ability to do basic work activity. Even if we accept Dr. McMurtry's conclusion in her letter of May 12, 2006, stating that Ms. Boring "has most likely suffered from [scleroderma] since 1994" (Tr. 174), it is insufficient for a claimant simply to be diagnosed with a potentially disabling condition. *See* Salles v. Comm'r of Soc. Sec., No. 06-2799, 2007 U.S. App. LEXIS 15304, *7-*8 (3d Cir. June 26, 2007), noting that although the record included diagnoses of HIV, hepatitis C, and depression, "in addition to the diagnoses, Salles was required to present evidence that these limitations *significantly* limited her ability to do basic work activities or impaired her capacity to cope with the mental demands of working" (emphasis in original); *see also* Walker v. Barnhart, No. 05-2282, 2006 U.S. App. LEXIS 5719, *8 (3d Cir. Mar. 6, 2006) ("Mere presence of a disease or impairment is not enough. A claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in any substantial gainful activity.") Thus, we are not persuaded by Plaintiff's argument that Dr. Thomas's repeated references in his medical records to Plaintiff's muscle pain and tightness, especially in her legs, and

18

his numerous attempts to ameliorate these conditions are sufficient evidence to support his May 2006 opinion that Plaintiff was disabled prior to her date last insured. As the ALJ found (Tr. 15-16), Ms. Boring's medical records show that although she was treated for these problems between June 1994 and March 1996, the rather sparse evidence for this period does not indicate that her condition prior to her date last insured was sufficiently severe as to preclude all substantial gainful activity.

The Court has also considered Plaintiff's argument that her testimony, together with the medical opinions of Drs. McMurtry and Thomas, supports the conclusion that Ms. Boring was disabled prior to March 31, 1996. (Plf.'s Brief at 8-17.) To the contrary, as the ALJ found, Ms. Boring's statements regarding the intensity, duration and limiting effects of her symptoms prior to her date last insured are not entirely credible. (Tr. 15.) For instance, after first testifying that she had not paid "much attention" to the date on which she had stopped working, Plaintiff agreed with the ALJ that she had done so in 1991. (Tr. 187.) However, the medical record includes two notes from which one may infer that she was working, at least part time, as late as June 1996. (Tr. 95 and 118.) She also reported that in 1991 she could not "stand without excruciating pain" and "couldn't walk very far" (Tr. 187), yet she admitted she did not consult a physician immediately (Tr. 188); moreover, the record shows no medical treatment for any chronic

19

pain until June 1994 and that she continued to carry on normal activities such as fishing, walking, cutting the grass, and deer hunting. In fact, as late as May 2000, she was able to stand "in cold water for a greater part of the day" while fishing. Although she experienced pain in her right knee subsequent to this event, Dr. Thomas related this to a "probable meniscus tear," not symptoms associated with scleroderma. (Tr. 112.) We also find Plaintiff's testimony at the hearing was repeatedly vague and inconsistent.[19] For instance, when asked by Judge Henry when she first consulted with Dr. Thomas, she was unable to respond until prompted by the ALJ that the date might have been June 13, 1994, and then replied, "That sounds good. Okay, I don't know." (Tr. 189.) The complete absence of any reported medical treatment from May 1, 1991, Plaintiff's alleged onset date, through June 1994, and again from May 23, 2000, through August 5, 2002, further supports the ALJ's conclusion that Plaintiff's condition was not disabling. As the United States Court of Appeals for the Third Circuit has pointed out, lack of medical evidence may be "very strong evidence" that

---

[19] This vagueness and inconsistency extends to Plaintiff's written documentation. For instance, when requesting review by the Appeals Council, Plaintiff stated that she had "been unable to work since 1993 because of the pain" associated with scleroderma. (Tr. 8.) In a questionnaire completed in March 2005, Plaintiff stated that she had stopped working "12 years ago" due to pain and fatigue, which would establish an onset date in 1993. (Tr. 73-74.) These reports are inconsistent with both her earnings record which shows no reported income after 1991 (Tr. 55) and her application for benefits in which Plaintiff alleged that she had stopped working due to her disability as of May 1, 1991 (Tr. 58.)

20

the claimant is not disabled. *See* Lane v. Comm'r of Soc. Sec., No. 03-3376, 2004 U.S. App. LEXIS 10948, *14 (3d Cir. June 3, 2004), *citing* Dumas v. Schweiker, 712 F.2d 1545, 1553 (3d Cir. 1983) for the principle that an ALJ is entitled to rely not only on what the record says, but also on what it does not say.

Moreover, although Dr. McMurtry opined in May 2006 that "the nature of [Ms. Boring's] disease has made her unable to hold a full-time job, even in a sedentary environment" (Tr. 174), any implication that Plaintiff's condition was disabling prior to March 31, 1996, is belied by the doctor's report of May 6, 2005, which reported normal sensation, motor power and reflexes, a full range of motion, and no functional limitations related to the diagnosis of scleroderma. (Tr. 158-159.)

Contrary to Plaintiff's argument, the ALJ did not err by failing to give controlling weight to the letters provided by Drs. Thomas and McMurtry, despite the fact that they were, respectively, Plaintiff's long-term treating physician and a specialist in rheumatology.[20]  We recognize, of course, that retrospective

---

[20]  Social Security regulations carefully set out the manner in which medical opinions are to be evaluated. 20 C.F.R. § 404.1527(d). In general, every medical opinion received is considered, regardless of its source. However, it is well-established that an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993). Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment

21

opinions such as those of Drs. McMurtry and Thomas provided in May 2006 can, under certain circumstances, be used to establish an earlier disability onset date. Ricci v. Apfel, 159 F. Supp.2d 12, 20 (E.D. Pa. 2001); Agnese v. Chater, 934 F.Supp. 59, 62 (E.D. N.Y. 1996). But where there is no evidence of actual disability prior to a claimant's date last insured, "a treating physician's retrospective diagnosis is insufficient to establish a disability" and an ALJ does not err by declining to give such a diagnosis controlling weight. Candelario v. Barnhart, No. 05-1222, 2006 U.S. App. LEXIS 3347, *16-*17 (10ᵗʰ Cir. Feb. 10, 2006).

Finally, the Court is not persuaded by Plaintiff's contention that "the ALJ failed to comply with SSR 83-20 and Third Circuit precedent which requires that a medical expert be called to testify when the claimant's onset date of disability must be implied retroactively from the medical evidence." (Plf.'s Brief at 21.)

---

relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); *see also* Fargnoli v. Halter, 247 F.3d 40, 43 (3d Cir. 2001), and Sykes, 228 F.3d at 266, n.7. The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p,"Giving Controlling Weight to Treating Source Medical Opinions." Contrary to Plaintiff's argument that the ALJ did not describe how she weighed the opinions of Drs. McMurtry and Thomas, she explicitly referred to 20 C.F.R. § 404.1527 and SSR 96-2p (among others), as the basis on which she had evaluated all opinion evidence. (Tr. 15.)

Contrary to Plaintiff's argument, SSR 83-20, "Onset of Disability," does not apply in this case. "SSR 83-20 addresses situations in which an ALJ makes a finding that an individual is disabled as of a certain date, and the question arises whether the disability arose at an earlier time." Ricci, 159 F. Supp.2d at 21, citing cases. As stated in the Ruling,

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

As Defendant points out, an ALJ is obligated to call a medical advisor only when the medical evidence is ambiguous or insufficient to establish the disability onset date. (Defendant's Brief in Support of His Motion for Summary Judgment, Doc. No. 15, at 20-21, *citing* Walton v. Halter, 243 F.3d 703, 709-710 (3d Cir. 2000) and Jakubowski v. Comm'r of Soc. Sec., No. 06-1377, 2007 U.S. App. LEXIS 484, *7-*9 (3d Cir. Jan 10, 2007).) In short, a medical examiner must testify if the claimant's disability is beyond dispute and the only question is when the disability began, a situation which does not apply in this case. As in Ricci, the medical evidence here is not ambiguous; although Plaintiff was treated for lower back pain, abnormal muscle tone, muscle tightness and spasms between 1994 and 2005, the evidence does not show that

23

these problems were disabling prior to March 31, 1996, her date last insured. We find, as did the Court of Appeals in Jakubowski, "the ALJ in this case had access to adequate medical records from the time period before the expiration of [Plaintiff's] insured status, and these records did not support her alleged onset date." Id. at *11.

Plaintiff's motion for summary judgment is denied. An appropriate order follows.

January ___ / 7 ___ , 2008

_William L. Standish_
William L. Standish
United States District Judge

cc: Counsel of Record

24